### PROSECUTION EOR LOANING MONEY ON CHATTELS WITHOUT A LICENSE.

Court of Appeals for Montgomery County.

CHARLES HOUSER v. STATE OF OHIO.

Decided, January, 1916.

*Criminal Law—Loaning Money on Chattels—Means Loaning on the Faith or Pledge of Chattels—Money.Broker's License Law—Can Not be Given Greater Deterrent Effect by Broadening its Construction.*

A conviction can not be had as for the violation of a statute which prohibits the business of "making loans upon chattels or personal property of any kind" without first obtaining a license as provided in the act, where the evidence of the loan consists only of a note of hand, unaccompanied by any enforceable security "upon chattels or personal property;" a paper writing, signed by the borrower, but not sworn to nor recorded nor filed for record, the only material parts of which are certain recitations to the effect that the signer is the owner of certain undescribed chattels and that these are unencumbered, the writing being delivered to the lender, is not the security contemplated by the act.

GRANT, J.

Error to the court of common pleas.

Charles Houser, plaintiff here, was tried in the municipal court of the city of Dayton, as for a violation of certain provisions of Section 6346 of the General Code of Ohio.

The affidavit upon which his trial was there had, and which was the first step towards jurisdiction taken by the trial court, was in the following words and figures, as to its material and charging parts:

"Did unlawfully then and there carry on the business of making loans upon personal property, by then and there loaning the sum of twenty and no/100 ($20.00) dollars to one Mary Brown upon certain personal property, without first having then and there obtained a license so to do from the secretary of the state of Ohio, the said Charles Houser, not then and there being engaged in business as a bank or building and loan asso-

ciation, contrary to the statute in such cases made and provided, and against the peace and dignity of the state of Ohio.''

The trial resulted in the conviction of the accused and he was sentenced to pay a fine of $—— and the costs. A new trial having been denied and an exception saved, error proceedings to reverse this judgment of conviction were prosecuted in the court of common pleas, where the judgment was, upon consideration, affirmed. We are now asked to reverse both of these judgments.

Various formal assignments of error are made, but the one relied on as basic in the case is that the conviction had in the court of first instance can not be supported by the evidence and so is contrary to law.

The two sub-sections of the statute upon which the accused was prosecuted and convicted, and which alone are material here, read, respectively, as follows:

Section 6346-1. ''No person, firm or corporation except banks and building and loan associations shall engage or continue in the business of making loans upon chattels or personal property of any kind whatsoever, or of purchasing or making loans upon salaries or wage earnings, without first having obtained a license so to do from the secretary of state.''

Section 6346-6. ''Any person, firm or corporation, or any agent, officer, or employee thereof, violating any provision of this act, or that carries on the business of making loans upon chattels or personal property of any kind whatsoever, or of purchasing or making loans upon salaries or wage earnings without first obtaining a license as provided in this act shall, for the first offense, be fined not less than fifty dollars ($50.) nor more than two hundred dollars ($200), and for a second offense not less than two hundred dollars ($200) nor more than five hundred ($500) dollars, and it shall thereupon become the duty of the secretary of state upon such second conviction to revoke any license heretofore issued to such person, firm or corporation.''

The inhibition of these provisions, so far as it touches the accused in this case, is against loaning money ''upon chattels or personal property,'' without first having obtained a license to do so from the secretary of state.

We assume as fully proved that the accused had no such license.

For the rest, the single kernel of grain in the case, when sifted clear of a good deal of chaff—all the papers before us being considered—is to be found in the following and only material facts :. A woman applied to the accused, or the concern for which he must be deemed responsible, for a loan of money. Finally, and after some circumlocution, she got it. It was evidenced by one, or perhaps two, promissory notes, in the ordinary cognovit form, and in no other way.

These notes were not secured in any way beyond the signature of the maker. At the time, the woman was asked to sign and did sign a paper, which was represented to her by the lender as being a mortgage upon her furniture. It was not a chattel mortgage, nor anything resembling a mortgage. It consisted of several statements or recitations, the most material of which were of the tenor and effect that certain undescribed property belonged to the applicant for the loan and was in no way incum- bered. The paper was not sworn to, nor was it ever filed or recorded in any public office, so far as appears.

The ulterior purpose of the accused and his coadjutors in the enterprise, probably was to get the woman to believe she was giving a mortgage on her furniture, in the expectation that she would be sufficiently frightened by that thought not to part with her belongings till the debt was paid, so that the lender would in effect have all the security that a mortgage would give him, without any of the disadvantages of taking a mortgage, including the taking out of a license under the statute. Still, it was not a mortgage, nor anything like a mortgage.

These being the facts alone essential, in our estimation, to a determination of the question before us, we are now to inquire what that question is.

To our apprehension and in this case, it is whether the loan made by the accused, under the circumstances mentioned, was a loan "*upon* chattels or personal property of any kind," as those words are used in the statute under consideration. For loans thus made are the loans denounced by the statute when

made by an unlicensed person, and for making which punishment was visited upon the accused by the judgment complained of here.

"Loaning *upon* chattels," we take it, means loaning on the faith of chattels, on the security of chattels, on the pledge of chattels—the faith, the security, the pledge, in any case being made good and effectual by some legally recognized and binding form of sanction. Such we apprehend is the usual, the ordinary and plain significance of the words used by the lawmakers in framing the enactment. In the absence of any reason apparent for imputing to them a technical or other different meaning, no reason is perceived for a departure from this customary use of them now. To force another meaning into them would, in our judgment, amount to an assault on the English language, or would at least be taking improper liberties with it, if not doing outright violence to it.

Indeed, we do not know that another meaning is seriously contended for here. The contention, rather, seems to be, if it is understood, that what is called a liberal construction of a penal statute shall be allowed in order that some general or wholesale mischief to the community at large shall be—not exactly punished in the person of the particular offender, but to secure immunity against future like offenses—such seems to be the argument, in effect, although of course the example of punishment in the case in hand must be visited on the accused at the bar, who, lest others may offend, is to feel on his own back the legal rod in pickle provided by the statute in question.

Shifting momentarily from legal to medical nomenclature, the claim appears to be that this penal law is to be used as a prophylactic, or, in common parlance, as a deterrent, against future misdeeds of other evil-minded persons, the prisoner to suffer vicariously in that respect as well as properly for his own misdoings. Certainly, if his own crime is made out beyond a reasonable doubt, then he should suffer for that single reason, and it would not be difficult to separate his proper and real offending from that which is sought to be reached by way of example to others.

But that does not appear to be the drift of the argument made to us, if we rightly catch it. We are asked to affirm a conviction arising not so much from a plain infraction of the known letter of a penal statute, as from what the "Immortal J. N." used to call "the attitude of the situation." That is, a necessity springs from the notorious bad conduct of so-called "loan sharks" and their oppression of the needy, which can be met only by the condign punishment of some one, in order that the practices may be guarded against and stopped. And of course the "horrible example" must be at hand as equally necessary, in order that this remedy may be advanced. It looks like a variety of that "military necessity" under which Dayton, Ohio, groaned a half century and more ago, and of which its people hoped themselves well rid, and all the country said Amen. Even Mr. Lincoln was ashamed of it. A citizen, by a process unknown to the law's letter, to sustain which, as here, "the spirit of the law" was invoked, was seized and sent into the military lines of an armed enemy. General Burnside, in his return to the writ of habeas corpus, said: "An emergency is upon us which requires the operations of some power that moves more quickly than the civil." And the federal judge who denied the writ, in his opinion, said:

"The occasion which calls for the exercise of this power exists only from the necessity of the case; and where the necessity exists, there is a clear justification of the act. * * * In the judgment of the commanding general the emergency required it; and whether he acted wisely or discreetly, is not properly a subject for judicial review."

This is not far different in tone from the appeal put up before us to look with leniency on a conviction which may be upheld if the "spirit of the law" can only be brought to bear. The doctrine appears to us somewhat vagrant, not to say lawless. We should as soon look to see the court of Star Chamber and its practices resurrected and transplanted to Dayton, as to think the Burnside theory of what law is has been revived and brought back among you.

"In Adam's fall we sin-ned all," said the old catechism. It was all right to punish Adam, but the rest of the line has not gained a foothold in enlightened jurisprudence. We see nothing in the reason of the thing why Charles Houser should not be condemned if he has broken the commandment of the statute. We see no reason why he should be condemned if he has not broken the law, even though an example may be needed to keep others from breaking it. The probably mythical English judge who is said to have said in sentencing a culprit—"We hang you, not for stealing horses, but that horses may not be stolen," has not been thought to have spoken in the voice of a just or humane jurisprudence.

Of course the proposition is not put up to us in this precise form. We are not in so many words asked to wrest a statute from its import of language, not on the side of leniency, but of severity, to the end that an ultimate general public good may result. But the appeal to interpret the statute not so much according to its letter as in its "spirit" of tutelage over the common welfare, to the disadvantage of a prisoner—in substance and effect to resolve the doubt, if there is one, not in his favor, but against him—the purport, we say, of the exhortation can hardly be mistaken. We can not allow the force of it to coerce a judgment on our own part, which would be at variance with that commended by the facts of this case and the law applied to them, stripped of the ulterior consequences which may be supposed to flow from our action here upon the community, *aliunde*.

Having regard to this consideration and following the example of the prudent mariner who has been swept from his course by a gale of wind, we may with propriety, we think, take our bearings according to the chart of the statute, the breach of which is by the judgment complained of imputed to the accused. We have already adverted to what it prohibits, and have shown, as we suppose, that what the accused did violated none of the things forbidden by it. In other words, it is too plain for dispute, as appears by the evidence, that he did not loan Mrs. Brown money upon the faith, or pledge or security of chattels, although he made her think that he was doing so. He is not

charged with obtaining money under false pretenses. What he really is charged with is not having a license. Collecting license fees is not the end or purpose of the statute; that is but the taxing incident of the law, designed to raise the revenue necessary to its administration.

Failure to obtain a license is not the mischief aimed at and to be repressed by the statute. Before going far afield for vagrant authorities to justify stretching the letter of a law that it may be executed in what is vaguely called its "spirit," we may observe one canon of construction by going to the title of the act to find out what its framers were striking at when they put it in words. That title is this: "An act to regulate and license the loaning of money upon chattels or personal property of any kind and of purchasing or making loans upon salaries or wage earnings." It appears to us too clear for controversy that the mere failure to obtain a license, of itself and without more, without the further fact of loaning money on chattel security, is not enough to call down on the head of one who fails to have a license the penal consequences of a broken law. That professional lenders are bad men—some or all of them—is quite beside the question, as we must think. The defendant below was not prosecuted for being an all-around bad citizen, nor can he be punished for that, however culpable in that respect he may be. Bad citizenship is not a crime in this commonwealth. If it were, the formula of the crier would indeed be appropriate: "God save the state of Ohio, and —!"

Upon full consideration in the case lately reviewed by us in the Eighth District—*State of Ohio* v. *French et al,* construing this same statute—we held, affirming the common pleas, that the words of the title declaring the mischief to be remedied by the act and defining its repressive purpose, are to be distributed over all of its subsequent provisions. The supposed offense prosecuted in that case consisted in not giving the borrower a card, as required by sub-section 3 of the act. The difference between the two cases in point of law, is, we think, *nil.*

We adhere to that holding, finding nothing in the considerations brought forward here to shake our confidence in its cor-

rectness. To do otherwise—finding the facts where we do find them—would place us under the reproach of allowing a man to be punished because he did not pay for a license to do a thing he did not do. This would be a legal solecism and a contradiction and confusion of moral terms.

In reaching this conclusion—somewhat laboriously, it is true—we have paid but scant attention to the elaborate discussion of the supposed law of the case, on either side, backed as this is by numerous citations put before us with characteristic industry and zeal. But attention has been paid to them, and, in the view we have taken of the case, a particular discussion of them would not be useful or informing. They are largely addressed to the appeal—already met and disposed of—to construe the controlling statute as a drag-net, where a particular man is asked to be punished under it, or in the words of the contention to apply its spirit if its letter shall not be enough. We have said all that we care to say on this point. To work a conviction the statute must point its finger to this individual accused with that degree of inerrancy which the criminal law requires at the hands of the state, and be able then to say: "Thou art the man!" That requirement has not been met; that burden has not been borne, but the reverse, as the evidence without contradiction shows.

We have the utmost respect for the authorities brought forward in the briefs. In our opinion they are beside the question. We feel that we must keep within the known land-marks of the law, and not stray into the fields of speculation as to what might be if it were interpreted in what is called its "spirit" and intention, instead of declaring it as it says and in our estimation plainly is. That this offender, and likely other evil-minded persons, may go unwhipped of justice because we administer a statute according as we find it to be, and not according to what it might be or should be, is true. But really we must not concern ourselves with that or permit that consideration to control us in any way. We are not the Legislature. Our guide is *"Est ita lex."*

We deem ourselves guilty of no impropriety in closing our opinion in speaking of a statement to be found in one of the briefs. It is this:

"The common pleas court, after having heard the arguments of counsel and considering briefs, handed down a very able opinion sustaining the conviction of the municipal court, and now the plaintiff in error seeks to have this opinion set aside."

If our function in this case is to set aside opinions, then we have labored under a singular delusion as to what the one duty of any court is—namely, to declare the law. We disclaim the right or the wish to do more.

What the consequences flowing from that declaration may be, is matter of indifference. We might as well concern ourselves with our shadows on the wall.

Fortunately there is a court for the correction of our errors, and we have no ambition but to be right, even at the expense of being set right by the power whose duty it is to do that. The law is the ruler of us all, and it behooves us all to walk with John Milton, "as ever in his great Taskmaster's eye."

There is no evidence in this record to support either of the judgments complained of.

For that reason both are reversed and final judgment for the plaintiff in error, to recover his costs, expended, is rendered.

MEALS, J., and CARPENTER, J., concur.